```
DILLINGHAM & MURPHY, LLP
WILLIAM GAUS (SBN 05499)
BARBARA L. HARRIS CHIANG (SBN 206892)
wg@dillinghammurphy.com
bhc@dillinghammurphy.com
225 Bush Street, 6th Floor
San Francisco, California 94104-4207
Telephone:   (415) 397-2700
Facsimile:   (415) 397-3300

Attorneys for Plaintiff
GEORGE CHEN
```

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE CHEN,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED WAY OF THE BAY AREA AND DOES 1-10, INCLUSIVE,<br><br>Defendants. | Case No.: C 07-02785 WHA (JCS)<br><br>DECLARATION OF GEORGE CHEN IN OPPOSITION TO PETITION TO COMPEL ARBITRATION<br><br>Date: August 16, 2007<br>Time: 8:00 a.m. |

GEORGE CHEN declares under penalty of perjury that the following is true and correct of his personal knowledge.

1.   I am plaintiff in the above-captioned case.

2.   I interviewed for the position of Chief Financial Officer of United Way of the Bay Area beginning in March, 2001. I was offered the position and began work for the United Way of the Bay Area on or about May 16, 2001.

3.   On my first day on the job, I was given an "employment package" which included an application form and an employment agreement.

4.   At the time I was hired, all of the "back office" functions of UWBA including the Human Resource function had been outsourced to a supposedly independent "spin off" known as PipeVine, Inc. This supposedly independent company was set up to perform

UWBA's "back office" functions and to solicit business from other organizations, thus, in theory, achieving efficiencies and economies of scale for UWBA and others. The employment package was presented to me by PipeVine personnel who had no role in my hiring.

5. I completed several forms, including the employment application and signed the employment agreement. I understood that all of these documents were necessary for me to be employed. These documents were not presented to me as proposals, but as essential parts of the employment process for every employee. The persons presenting these documents to me were PipeVine personnel, who informed me that I had to sign these documents without modification.

6. The document attached as Exhibit B to the Declaration of Eric McDonnell was a form which was used at that time for every employee. It was not shown to me in advance of my starting work. The rules from the American Arbitration Association Voluntary Labor Arbitration Rules were not attached to the document I was given and were not included in the package of documents I was given to fill out and sign.

7. While at UWBA, I observed many practices that were inconsistent with sound financial reporting. I questioned whether UWBA was correctly reporting revenue received from Clorox Corporation in view of the fact that most of the revenue reported by UWBA as being received from Clorox was not raised by UWBA, did not come to UWBA, was not processed by UWBA and had no other connection to UWBA. This misreporting of revenue inflated UWBA's total revenue, helping to conceal the true extent to which UWBA's dollars were devoted to overhead, rather than service to the target communities. UWBA sought to underreport its overhead to the same end. In both cases, the reporting sought by UWBA management was inconsistent with sound financial reporting and, in some cases, I would not sign off on financial reports because of these inaccuracies until they were corrected.

8. All of UWBA's back office business operations including Finance & Accounting were performed by PipeVine. I had no staff, not even a secretary. I could not so much as write a check on a UWBA account. It soon became apparent, however, that PipeVine was not performing its functions in a professional manner and did not appear capable of

performing the tasks entrusted to it.

9. I warned my superiors and members of the UWBA Board and Finance Committee that I reported to that PipeVine was not performing its functions for UWBA in a professional manner and that it had no capability of attracting other organizations or of performing competent work for them in order to remain a viable organization.

10. My actions generated friction with my superiors who defended PipeVine and refused to make changes. PipeVine personnel resented my inquiries into their activities and two PipeVine employees went so far as to file a formal complaint accusing me of creating a "hostile work environment."

11. On issue after issue, including the misreporting of revenue and overhead, the malfeasance of PipeVine and other issues, UWBA eventually had to accept that sound financial management and reporting did not allow the practices they favored. Eventually, UWBA had to stop reporting all revenue raised by Clorox as UWBA revenue and had to accept the correct reporting of its overhead. The incompetence and malfeasance of PipeVine, including the employees who accused me of creating a "hostile work environment" has been demonstrated by the misappropriation and loss of millions of dollars of donor funds. This year alone, I have had to testify in two separate proceedings, accusing UWBA and its agents of malfeasance in the loss of millions of dollars in donor funds.

12. My opposition to improper financial management and reporting created hostility on the part of UWBA management despite the fact that, once PipeVine collapsed, I was able to restore UWBA to relative financial health by applying standard financial controls and discipline to UWBA's operations and overhead spending, despite a significant decline in annual campaign revenues, due to public disenchantment with UWBA. In FY2006, we had significant issues similar to the issue over reporting of Clorox revenue, but this issue involved Chevron Corporation, the largest of the corporate campaigns that UWBA took credit for, despite receiving only a fraction of the revenues it reported. My opposition to improper financial reporting with respect to funds received from SBC Corporation led the Chief Executive Officer to threaten to fire me. Eventually, the CEO had to bow to the weight of and

1  warnings from outside authority on this issue. The CEO was equally hostile to my
2  recommendation that payments to union officials who did no work for UWBA and rental
3  payments for Union offices should be reviewed and reduced or eliminated. The CEO and other
4  members of senior management also reacted in a very hostile manner to my efforts to scale
5  back their proposal for a substantial increase in overhead spending for FY 2007.
6      I declare under penalty of perjury under the laws of the State of California that the
7  foregoing is true and correct.
8      Executed at Walnut Creek, California, July 23, 2007

George Chen